(No. 25652.—)
SAMUEL W. TURLEY *et al.* Appellants, *vs.* LUTHER TURLEY
*et al.* Appellees.

*Opinion filed October 11, 1940—Rehearing denied Dec. 10, 1940.*

TRAPP & TRAPP, for appellants.

C. H. WOODS, for appellees.

Mr. JUSTICE SHAW delivered the opinion of the court:

On September 22, 1928, Toliver L. Turley, conveyed
115 acres of land in Logan county and 15 acres in Sangamon
county to his cousin Luther Turley, as trustee, for certain
uses: (1) To mortgage or sell for the payment of any of

the grantor's debts; (2) to pay the net income to the grantor during his lifetime; (3) to use any portion of the principal for the support of the grantor; (4) to manage, invest, reinvest, etc., and (5) to convert into money at the grantor's death and divide equally, one-half to Francis Loren Turley, son of a deceased nephew of the grantor, and the other half in equal shares to Jessie May Turley and Marshal H. Turley, children of the trustee. The grantor, Toliver L. Turley, died intestate April 28, 1933, leaving neither widow nor children nor descendants of any child or children, but only collaterals and descendants of collaterals, all of whom are parties to this suit. A few days after the death of the grantor this bill was filed seeking to set aside the above deed of trust because of the alleged insanity of Toliver L. Turley, and the claimed existence of a confidential relation. Exceptions to a master's report were overruled and a decree entered in accordance with his recommendations that the bill of complaint was without equity and should be dismissed. This appeal is from that decree.

Several hundred pages of testimony were taken, but most of it is of a trifling and inconclusive nature. It is said on the one hand to prove hallucinations or delusions that Toliver Turley had wrong notions about corn rows being crooked and the existence of Canada thistles. On the other hand, there is evidence as to his exact knowledge of the price of corn and the condition of his bank accounts. The substantial evidence, which is not materially disputed on either side, indicates that in June, 1928, Toliver Turley's mind became impaired to such an extent that it was necessary to take him to the Norberry Sanatorium at Jacksonville, where he remained until a few days before the execution of the deed in question. It is to be inferred from the record that Turley voluntarily entered this institution to secure the dismissal of a petition for the appointment of a conservator, which was then pending. It is clear from the evidence that he was then suffering from delusions of

persecution; that he believed that he was being followed by various persons who had designs against him, none of whom, however, were believed to be any of his relatives. It seems that at various times he adopted devious routes and devices in going from one place to another from fear of his supposed persecutors.

Doctor Clark and Doctor Norberry and Miss Iva Lee Todd, the head nurse of the sanatorium, each testified at some length, and the substance of their testimony is that Turley was suffering from maniac depressive psychosis. The doctors at the sanitarium testified that his condition was improved when he left the hospital and returned home shortly before the date of the deed. Doctor Perry testified that he examined Turley a day or two after the date of the deed and that that examination disclosed little, but that in the following weeks he examined him further and found him to be suffering from the same kind of psychosis described by Doctors Clark and Norberry. The record is silent as to what happened between the approximate date of the deed and April of 1933, but it does appear on the latter date Toliver Turley went to Kansas to visit a cousin. While there he became violently insane and was placed in a padded cell where he beat his head upon a stone floor and was kept confined until he was brought back to Illinois, where he died the same month.

On the whole record, it is entirely clear that Toliver Turley suffered from a maniac depressive phychosis, which began sometime prior to June of 1928, followed a normal course and ended with his death in 1933. While there is a general presumption of sanity, yet, when a condition of insanity is shown to exist it is presumed that this continues unless the disorder is of such a character as to indicate that it was probably of a temporary duration. (*Emery* v. *Hoyt,* 46 Ill. 258; *Langdon* v. *People,* 133 id. 382.) Under such circumstances, the burden is upon the proponent of the instrument to show that it was executed during a lucid interval. (*James White Memorial Home* v. *Haeg,* 204 Ill. 422.)

In Medical Jurisprudence by Herzog, section 612, speaking of this type of psychosis it is said: "The name 'circular insanity' was given to the disease because of its periodicity, or rather because an attack of mania is followed generally by a stage of depression, which is followed in turn by an interval in which the mind is, or at least seems, perfectly clear, upon which follows again mania, depression and clear interval. There are, therefore, complete recoveries from the attacks, but there is no real recovery from the disease as at any time an attack may recur." The testimony of all the medical experts conclusively show that Turley's psychosis was of this character and the question for the trial court was, therefore, to determine, as a matter of fact, whether this deed was executed during a lucid interval and he found that it was.

The record shows that Toliver Turley's desire to benefit the children of Luther and one other son of a deceased nephew was of long standing and based upon real, even if vindictive, reasons entirely unconnected with any delusion or insanity. His troubles with his other relatives date back at least twenty years prior to the execution of this deed. In 1908, Toliver Turley was in trouble over a stabbing affair, which was disposed of in the Appellate Court of this State in *Spenler* v. *Turley,* 158 Ill. App. 146. The record shows that ever after that case Toliver felt that Luther had stood by him in it and that his other relatives had thrown him down. There is also evidence of another affair in which he had stood by Luther and it seems entirely clear that he and Luther were close to each other, while the other relatives appear to have been estranged. Each of the doctors, and most of the lay witnesses, admitted the existence of lucid intervals, and there are many letters in the record written by Toliver at different times indicating clearly that, at least at the moment of writing, he was clear in his mind as to business matters. The attorney who prepared the trust deed gave evidence satisfactorily showing a lucid state of mind both before, during and after the execution of the

deed, as did also at least one other witness. As to the grantor's general condition there may be said to be some balance in the evidence, tending on the whole, as above indicated, to establish the existence of the maniac depressive psychosis. On the other hand there is no direct evidence tending to disprove the existence of a lucid interval at the time the deed was actually prepared, executed and recorded, as testified to by attorney Harris.

In *Harrington* v. *Travis,* 349 Ill. 606, we laid down the rule that the test of mental capacity to make a deed is that the grantor must have sufficient mind and memory to comprehend the nature and effect of his act, and that, if he is able to do so, and exercise his own will, the deed is valid. It is clear from the testimony of attorney Harris that in making this deed Toliver Turley was exercising what had been his will for many years prior to its actual execution, and that, rightly or wrongly, it was the result of heat which had been generated at least twenty years previously. When he executed this deed Turley did exactly what he had told his attorney five or six years earlier that he actually wanted to do. We are satisfied that the chancellor had before him ample evidence to support his finding of fact that the deed was executed at a lucid interval and we will not disturb that finding. Some effort is made to argue that the deed may have resulted from a presumed undue influence, resulting from a presumed confidential relationship between Toliver and Luther Turley. The argument is unsupported by any substantial evidence of the existence of such relationship. Furthermore, Luther Turley did not personally benefit from the execution of this deed, was not present when it was executed and is not shown to have had anything at all to do with procuring its execution. We are unable to find any error in the proceedings of the trial court or the decree that has been entered.

The decree is affirmed.

*Decree affirmed.*